ROBERT H. HESTER *et al. v.* CHARLOTTE HESTER *et al.*

1. DEED OF GIFT. *Evidence. Burden of proof.* Where a person claims by deed of gift from one greatly enfeebled in body and mind, the burden of proof is on him to some extent, not clearly defined, to show that he had no voice in the transaction, or if he had, that his action was free from fault, or that the donor had the benefit of a full consultation with some disinterested third person.

2. SAME. *Mortgage. Equity of redemption.* A grantor may, by a mortgage or trust deed made to secure a debt, convey to the creditor, by voluntary gift, the equity of redemption if the land be not redeemed during life, the beneficiary, by reason of relationship or otherwise, being clearly shown to be an object of the grantor's bounty.

FROM SHELBY.

Appeal from the Chancery Court at Memphis. W. W. McDOWELL, Ch.

HARRIS & TURLEY and W. M. RANDOLPH for complainants.

TAYLOR & CARROLL for defendants.

COOPER, J., delivered the opinion of the court.

Bill by the heirs of John B. Hester, who had died intestate, being the two brothers and a nephew of the deceased, against Charlotte Hester, the intestate's widow, and Dora Sovy, a daughter of Charlotte by a former husband, to set aside a deed of gift of a lot in Memphis made by the intestate to his wife, and a deed of trust of an adjoining lot made by the intestate to a trustee to secure a debt due to Dora Sovy. The chancellor set aside the deed to the wife, and allowed the complainants to redeem the other lot. The Referees have reported that the decree should be affirmed. The widow and her daughter have excepted to the report.

The intestate's estate is insolvent, the two lots in controversy being the only property of which the intestate died possessed. Hester was a ship carpenter, and at one time was in partnership with a man by the name of Sovy. He then owned the lots in question, lived on one of them, and rented part of his house to his partner. Sovy died in 1855, leaving a widow, the defendant, Charlotte, and two daughters, the defendant, Dora, being the oldest, and then about two years of age. The widow and children continued to live in the same house with intestate. The youngest daughter married the defendant, W. B. Hood. The oldest daughter continued to have a room in the house, but seems to have spent much of her time after she grew to womanhood at New Orleans, St. Louis, and

other places. During the last years of his life, Hester, the intestate, seems to have become a hard drinker. He appears to have had a sunstroke in 1877, a paralytic attack and the yellow fever in 1878, took to his bed in May, 1879, and died about the middle of August of that year. On May 8, 1879, he was married to the defendant, Charlotte, the marriage license having been obtained by Hood, the wife's son-in-law, because, as he testifies, the intestate was then in bed, and unable to go for it himself. On June '21st thereafter, the deed of gift of the lot to his wife was executed, the intestate being at that time so feeble, according to the testimony of the attesting witnesses, that he could only speak in a whisper so low that what he said could only be heard by putting the ear close to his mouth.

The testimony is conflicting, and utterly irreconcilable, as to the extent of the failure of the mental faculties of the intestate during his last illness, and for several months before. That there was a gradual waning of his faculties is certain, and it is probable, as one or two of the medical witnesses testify, that for a year or two he had been suffering from a gradual softening of the brain. But it is proved that he served as a juror in the criminal court for several weeks during the months of December, 1878, and January, 1879, that he had some legal business with a lawyer in April, 1879, which he conducted in such a manner as to satisfy the lawyer that he fully comprehended it, and was entirely sound of mind, and that the lawyer who drew the deed of gift to the wife,

a different person, and the intestate's regular lawyer for years, and who visited him twice on the subject at an interval of a few days, was thoroughly satisfied of his mental capacity notwithstanding his bodily feebleness.    There was undoubtedly great weakness of body and mind for two or three months before his death, which left the intestate with little independent will, and that will easily influenced.    There was clearly no imbecility or actual want of capacity until within a week or two of his final dissolution. The rules of equity in such cases throws upon a person claiming by gift the burden of proof to some extent, not readily determined by definite lines, to show that the act was free and not procured by improper influence, and a degree of weakness far below that which would justify a commission of lunacy, coupled with other circumstances, to show that the weakness had been taken advantage of, would be sufficient to set aside the deed.    The question is one of fact, and all that can ordinarily be asked of a beneficiary is to show that he had no voice in the transaction, or if he had, that his action was free from fault, or that the donor had the benefit of a full consultation with some disinterested third person : 2 Lead. Cas. Eq., 1275.    It does appear that the intestate had the latter advantage with an intelligent and disinterested person, his own lawyer, who explained to him the difference between a deed and will, and urged him to make the latter instrument.    The intestate, after consideration, persisted in making a disposition of the property by deed.    On the one hand it may

be said that this persistence was due to sinister influences, and on the other that the intestate, conscious of speedy dissolution, might naturally desire to give all his property, while life remained, to his wife and her daughter. with whom he had so long lived. There is evidence, although rather of a doubtful character, the testimony of a colored nurse and of the. two brothers of the intestate, that the latter desired to have a private interview with his brother, which was prevented by the wife. Under these circumstances I was inclined to concur with. the chancellor and the Referees in thinking that the wife had failed to satisfactorily meet the requirements of the law, and that the deed should be set aside. But my brother judges are of a different opinion, and think that the intestate knew what he wanted, and with proper disinterested advice, freely and voluntarily caused the deed of gift to be drafted, and executed it.

The proof is clear that in April, 1875, the lot on which the intestate lived was levied upon, and sold under an execution against him, and that in March, 1877, he borrowed from the defendant, Dora Sovy, $400, with which to redeem the property. To secure her, he conveyed the lot in trust to the defendant, Hood, to secure his note at one year in favor of Dora Sovy for the money thus borrowed, with interest. This deed was executed on March 31, 1877, and authorized the trustee, in case of default of payment, to sell the lot for cash, on ten days' notice in a Memphis newspaper, free from the equity of redemption. The deed also contained this clause: "It

13—VOL. 13.

Hester *v.* Hester.

is further agreed and understood that should I die
before the debt herein secured is fully paid, Miss Dora
Sovy shall have the right, if she chooses, to become
the absolute owner of the property herein |conveyed
at the price of the amount of said note, and interest
due thereon, and by surrendering said note to my
personal representative, the absolute title to the land
shall vest in her immediately." The lawyer who
drafted the deed, testified that this was inserted by
the direction of the intestate, who said he desired
it to be done because Dora had grown up at his house,
and that if he died without paying the money he
would rather she should have it than any body else.
She did elect to take the property, surrendering the
note to an administrator appointed for that purpose,
and the trustee executing to her a quit-claim deed.

At the time this deed was executed, the testimony
leaves no doubt of the competency of the grantor to
make it, and that the transaction was exactly what
it purported to be. The instrument was not intended
to be a will, and cannot take effect as a will because
it is not in the handwriting of the grantor, nor at-
tested by witnesses. It conveys specific property for
a specific purpose, retaining the right to redeem dur-
ing life. The conveyance of particular property and
the actual delivery of the instrument as a deed fixes
its character: *Caines* v. *Marley*, 2 Yer., 582; *Cains*
v. *Jones*, 5 Yer., 250; *Watkins* v. *Dean*, 10 Yer., 321;
*Fry* v. *Taylor*, 1 Head, 594, 600; *Swails* v. *Bushart*,
2 Head, 561. And the question is whether as a deed
it is effective for the purpose expressed on its face.

There can be no doubt of the general rule, in Lord Nottingham's expressive phrase, "once a mortgage, always a mortgage" for purposes of redemption: *Newcomb* v. *Bonham,* 1 Vern., 7; *Cherry* v. *Bowen,* 4 Sneed, 415. But the decision in the case in which this language was used was reversed, on bill of review, by the succeeding Lord Chancellor in 1 Vern., 232. The case was this, the grantor made an absolute conveyance of land to Bonham, but by another deed of the same date the land was made redeemable upon payment of £1,000, and interest, at any time during the life of the grantor; and in case the land should not be redeemed in his life time, then he covenanted that the same should never be redeemed. He died without redeeming, and the heir of the grantor exhibited his bill to have a redemption. It was in proof that the mortgagor had a kindness for the mortgagee, as being his near relation, and did intend him the land after his death. Lord Keeper North, upon the hearing of the bill of review, conceding the general rule, was of opinion that *modus et conventio vincunt legem,* and said: "That where there is a condition or covenant that is good and binding in law, equity will not take it away": 1 Vern., 215. He held that there should be no redemption, " principally," he said, " because it was proved that the intent and design of the mortgagor was to make a settlement by the mortgage, and that he intended a kindness and benefit to the mortgagee in case he should not think fit to redeem the estate in his lifetime ": 1 Vern., 232. In the leading case of *Howard* v. *Harris,* 1

Vern., 190, . the mortgage contained a covenant that·
no one but the mortgagor or the heirs male of his.
body, should be admitted to redeem. The mortgagor
died without redeeming and without heirs male of the·
body. Both Lord Nottingham and Lord Keeper North
concurred in holding that the land might nevertheless·
be redeemed upon the general rule that an attempt
to fetter the right of redemption would be unavailing..
But the latter said : " If the case had been that a
man had' borrowed money of his brother, and had
agreed to make him a mortgage, and that, if he had·
no issue male, his brother should have the land, such·
an agreement made out by proof might well be de-
creed in equity." The English editors of the Lead--
ing Cases in Equity, in their notes on this case, say :
" Another exception or qualification of the rule is to
be found in that class of cases where the conveyance
of an estate to a person by way of mortgage is in-
tended to be in the nature of a family settlement ;.
further it seems, if the right of redemption is con-
fined to the life of the mortgagor, his heirs will not
be allowed to redeem ": 2 Lead. Cas. Eq., 1051, citing·
Bonham against Newcomb, and other cases. The law is:
also so stated in Jones on Mort., sec. 1041. And in this
State it has long been provided by statute that the
equity of redemption may be waived by contract. Oc-
cupying the relation he did to the beneficiary in the·
trust deed, who had been raised by him, the intes-
tate manifestly intended to make her a gift of the·
equity of redemption in the event of his death with-
out redeeming, and we see no reason why he should

·not be entitled to do so. It was his own voluntary :act without any suggestion from the beneficiary.

The exceptions to the report of the Referees will 'be sustained, the decree of the chancellor reversed, and :a decree rendered here in favor of the defendants, :and the bill dismissed with costs.