AUDREY KATES, by next Friend v. ANDERSON, DULIN, VARNELL COMPANY, et al.

Eastern Section. February 23, 1929.

Petition for Certiorari denied by Supreme Court, July 19, 1929.

Powers & Thornburgh, of Knoxville, for appellant.
Bowen & Bowen and J. R. Nichols, of Knoxville, for appellee.

DeWITT, J. The bill in this cause was filed by Audrey Kates, a minor, by her sister, Mrs. Grace Campbell, as next friend, to have declared fraudulent and void a judgment rendered by the circuit court of Knox county on August 21, 1926 for $625 and costs in a suit styled Audrey Kates by Nannie Kates (her mother) as next friend against Anderson-Dulin-Varnell Company.

On July 3, 1926, Audrey Kates, then about thirteen years of age, while walking on the sidewalk in front of the store of Anderson-Dulin-Varnell Company, was seriously injured by a brick falling from near the sixth story of the building and striking her upon her head. She thereby suffered a compound comminuted fracture of the skull. The bone of the skull was broken and small pieces of the bone were driven into the brain. She was rendered unconscious and remained so for about ten days. She was carried to a hospital where she was attended by Dr. Victor Henderson, a skillful surgeon. He removed several small pieces of bone from down in the brain. He cleaned the wound with normal salt solution, sutured the dura, or covering of the brain, and the wound and dressed it, and then he attended her twice a day until July 31, 1926, when she was discharged from the hospital.

Thereafter about once a week for three weeks he saw her at his office. He was of the opinion that she had then become perfectly normal, having made a complete recovery. She appeared to him to be in no abnormal mental or physical condition.

Anderson-Dulin-Varnell Company was insured by a liability company against claims for personal injuries thus occurring. This company paid all the expenses necessary to treatment of the girl—bills for surgical services, hospital services, nurse, etc., amounting to $519.75. It also agreed to pay to the mother of the child, for her benefit, the sum of $625 as full compensation for her injuries and suffering. The mother agreed to accept this proposition after several conferences with the adjuster, the last one being in the office of Anderson-Dulin-Varnell Company. The weight of the evidence is that the adjuster assured her that he would pay the money direct to her and that with this expectation she intended to remove to Harriman, her former home. She never employed or consulted counsel. She was very illiterate, not being able to read or write, and she was in poor health. She had never had experience with any lawsuit or legal matters. She had a son and two married daughters. One of her sons-in-law was present when the compromise was agreed upon. Of course, the plan for her, as next friend or parent, not a regular guardian, to receive the money was not lawful and would have been ineffective in any event by way of settlement. Miles v. Kaigler, 10 Yerg., 10; Cody v. Roane Iron Co., 105 Tenn., 515, 58 S. W., 850.

In order to consummate the proposed settlement, the counsel for the liability company caused Mrs. Kates and her daughter to meet him and the adjuster at the court house. They procured the issuance of a summons in behalf of Audrey Kates by Mrs. Nannie Kates, next friend, against Anderson-Dulin-Varnell Company "in a plea of damages for personal injuries, $5000." They immediately acknowledged service thereof in behalf of said company. They produced a declaration averring briefly the injuries received from the falling of the brick from defendant's building through the negligence of defendant, the pain, suffering and expense incurred. The declaration also contained the following averments:

> "Plaintiff further says that the said Audrey Kates has apparently recovered from the result of said injury, and does not anticipate any permanent injuries therefrom. Plaintiff expressly waives a jury and asks for judgment of the court on said matters."

This declaration was read over to Mrs. Kates and at her request her daughter Audrey signed her name to it. They were not represented by counsel. Thereupon Anderson-Dulin-Varnell Company by its counsel filed a plea of the general issue to the said declaration.

The attorney representing the defendant, an able and reputable member of the Knoxville bar, testified concerning the subsequent proceedings as follows:

"That was on August 21, 1926, and immediately we went into the court room, and after perhaps waiting until we could present the matter to the judge, we took this matter up. Mrs. Kates and Audrey Kates were present and Mr. Parris representing the insurance company. I stated to Judge Grimm that I knew nothing about the facts of this case except what had been reported to me; that the parties had agreed upon a settlement, and stated to him that the plaintiffs had no lawyers in the case and that I represented the defendants, Anderson-Dulin-Varnell Company, and had filed a plea in their behalf of not guilty; that the plaintiff was there and her mother was there and Mr. Parris was there and that I had a certificate of Dr. J. Victor Henderson with reference to the nature and extent of the injury of this girl, and because of the fact that the plaintiff had no counsel and of the fact that the girl was a minor, I wanted the court to examine the witnesses carefully, in as much as the accident appeared to have been serious in its nature. Thereupon the court did examine the mother on the witness stand quite extensively, and the daughter on the witness stand. He examined her head and the place where it had been operated on, and asked her about how she had been getting along since getting out of the hospital, with other questions of that nature, to satisfy himself that there was no permanent injury but that apparently the plaintiff was in a better condition than she was physically before she had this operation. I stated to the court that it was proposed to pay the doctor's bill, hospital bill and medical bills of that nature and stated what they amounted to. And I stated that it was proposed to pay $625 which it was reported that these parties had agreed to, the total amount being somewhere in the neighborhood of $1145. The court stated at the time, as I had stated to Mrs. Kates before going into the clerk's office, that in as much as this was for injuries to a minor and involved an amount in excess of $150, the court would require the appointment of a guardian to take charge of the money. He made that statement there and asked me to draw the order, which I did draw, and it was entered by the court."

In this testimony the witness was fully corroborated by the testimony of the trial judge and two disinterested lawyers who happened to be present and observed the proceedings.

The Special Chancellor who heard the cause found that no fraud was practiced upon the circuit court, but that the court ratified the

compromise settlement by awarding judgment for $625 being convinced that the injuries were not of a permanent nature. We concur in these findings by the Special Chancellor. He further found and determined as follows:

"I find that both counsel for the defendant and the judge of the circuit court (who determined the case without the intervention of a jury) did not know that there had been any permanent injuries inflicted upon the minor, and that they both believed that the amount offered in compromise was just and adequate. The declaration recites that no permanent injuries were anticipated, and the entire case was determined by the court upon the belief that there was no permanent injury. This being true, the minor not being represented by counsel, and the extent of her injuries not being sufficiently inquired into of witnesses qualified to know, there was in fact no adjudication of the rights of the minor complainant. We have here a case where there is an admission in the declaration filed on behalf of the minor by counsel who did not represent her, that she was not permanently injured, and the only testimony introduced was that of her mother who was prompted largely by the expectation of coming into the possession of the amount of the proposed settlement, and the minor's own testimony which, by reason of her incapacity, will not prejudice her rights here. The rights of this minor could not be adjudicated without a legal contest, and this proceeding could not be said to be such. It matters not that counsel for defendant acted in good faith, for the result, so far as the minor is concerned, is that she has been deprived of her right to a trial in the regular way.

"It results that the judgment of the circuit court aforesaid is declared void, and shall be set aside."

A decree was entered setting aside the judgment and taxing the defendant with the costs.

It is first insisted that this bill is a collateral attack upon a judgment rendered by a court having jurisdiction of the parties and the subject-matter and therefore should have been dismissed. This might be true if this were a collateral attack, but this attack is direct and not collateral. The single object of it is to avoid this judgment. This relief is not asked as incidental to any other relief. A direct attack upon a judgment is by appropriate proceedings between the parties to it, seeking for sufficient cause alleged, to have it annulled, reversed, vacated or declared void. 7 Ency. Dig. Tenn. Rep., 647; Jordan v. Jordan, 145 Tenn., 378, 456, 239 S. W., 423. In said case the Supreme Court quoted and applied the rules, from 23 Cyc., 1062, as follows:

"If an action or proceeding is brought for the very purpose of impeaching or overturning a judgment, it is a direct attack upon it, such as a motion or other proceeding to vacate, annul, cancel or set aside a judgment, or any proceeding to review it in an appellate court, whether by appeal, error, or certiorari, or a bill of review, or under some circumstances, an action to quiet title. On the other hand, if the action or proceeding has an independent purpose and contemplates some other relief or result, although the overturning of the judgment may be important, or even necessary to its success, then the attack upon the judgment is collateral."

Where the element of fraud or mistake is involved in the issue, it is a general rule that the attack is direct. 34 C. J., 521.

The attack in this case being direct and not collateral, the first assignment of error is overruled.

It is next insisted that the bill should have been dismissed for failure of complainant to show the authority for instituting the suit.

The next friend in this cause is a sister of the minor. Their mother was made a defendant. The defendant company in its answer denied the right and authority of the sister and her solicitors to file the bill in this cause and called upon them to show their right or authority. The minor is the real complainant. Neither her next friend nor her solicitors testified in this cause. The next friends swore to the bill and executed a pauper oath in lieu of cost bond, in behalf of the minor. If this girl is entitled to the relief sought, it is sufficient that her sister has brought her grievance before a court of chancery and has employed counsel for that purpose. Her acts in making oath to the bill prepared by counsel and executing the pauper oath show sufficient authority. No rule was made on her counsel to show that they were employed. The next friend of an infant, suing for him has full power to act to secure the infant's rights, and may do all things necessary to such end, and appoint counsel for the infant, incapable of employing one for himself. Roberts v. Vaughn, 142 Tenn., 361, 219 S. W., 1034. The second assignment of error is therefore overruled.

In the remaining assignments it is insisted that the court erred in holding that Audrey Kates has any permanent injuries resulting from the accident; and in holding the judgment void and setting it aside.

The Special Chancellor held that the girl was permanently injured; that this fact, or evidence tending to show it, was not presented to the circuit court; and that the judgment was based upon undisputed evidence that the injuries were not permanent.

The Circuit Judge, in testifying in this cause, was asked and answered as follows:

"Q. Judge, you approved this compromise of course on the assumption that her injuries were not permanent and that she had recovered? A. I did.

"Q. And if it had been shown to you on that occasion by other proof that as a matter of fact her injuries were permanent and that she would thereafter have considerable trouble with her eyes and be unable to study at school and have to have glasses the remainder of her life, which would partially correct her eye trouble, and that these glasses would have to be changed every two or three years, or at less intervals, and that at an expense to the girl or her guardian, and that as a matter of fact she would be subject to headaches and that every time she would stoop over to pick up anything, as she expressed it, there would be a kind of flop in her head and when she raised up she would have dizzy spells and stagger around for a while and suffer severe headaches, and that as a matter of fact the injury would, or would likely greatly affect her mental condition, then of course you would not have approved that compromise? A. That was not the case that I heard and disposed of, Mr. Bowen. I do recall distinctly that I asked the girl if she was suffering from headaches, and that she said she was not.

Objected to because not responsive to the question, Bowen, solicitor. Overruled, Harley G. Fowler, Special Chancellor.

"Q. Well, what I am asking you—you heard the case on the proof as it was presented to you at the time of course? A. Yes.

"Q. Now, if what I have related here had been presented to you on that occasion, then you would not have approved the compromise, would you—in other words, "if you were satisfied what I have asked you did occur? A. No, I would not have approved a compromise of that sort if the facts had been disclosed as you have related them, at that figure."

There is no doubt in our minds that upon the trial in the circuit court all of the parties, including the attorney, were honestly of the belief that there were no permanent injuries, that there had been a complete recovery. Dr. Henderson's certificate to this effect was read to the court. He did not appear in person and testify.

On December 12, 1927 the girl was taken to the office of Dr. H. E. Christenberry, an ear, nose and throat specialist of skill and experience, for examination. The weight of the evidence is that before the accident she·had never had trouble with her eyes. Afterward she continually had difficulty in reading. She testified: "Sometimes when I am studying I have to get up and go to the basement and wash my eyes about fifteen minutes and then I take a rag and dry them, and then they burn and sting, and when I come back up I

can't see anything hardly for about twenty minutes, it seems like all the letters run together.''

Dr. Christenberry testified that she was brought to him for treatment ''on account of her eyes bothering her and not being able to see good, and her head aching when she tried to study or read.'' He described the condition of her eyes as follows:

''We found in this case an imbalance of the ocular muscle, especially in the ciliary muscles, and she has three degrees of esophoria, that is a certain fixing and turning in of the muscles in trying to focus on a particular object. In looking into the eye, both the nerve heads were swollen, that is the nerve head, what we call the disc looked normal. The eye was bulged or standing out towards you with congestion in the veins and in the arteries, in the blood vessels which indicates that she has some inter-ciliary pressure or some disease of the optic nerve. Of course from the history, not being able to find any diseased condition there, we naturally concluded that it was from injury, from pressure, because you get—of course these things might be brought about by different inter-ciliary pressure or disturbance or pressure—but she has poor vision and it had to be corrected as best we could by glasses. Of course the ciliary condition is a question as to whether that can be corrected or not—the paralysis of the muscles, but as to correcting the distant vision, why glasses did correct that.''

Dr. Christenberry further said that this condition of interciliary pressure does not usually develop in a person of that age without a brain tumor, or meningitis, or something that caused such pressure; and that from the history of the case he was of the opinion that this condition of the eyes was caused by the accident. He said that it would be permanent, as he hardly saw how it could be corrected, although the glasses which he fitted to her eyes would correct her vision. He said that the disc on the head of the optic nerve is standing out from the pressure behind it, shortening the eye ball. A ''plus lens'' must be added to converge the rays of light to make them meet that shortness or deformed condition. Dr. Christenberry said that any condition similar to that, or eye strain, will cause headaches or pressure or irritation of the optic nerve; that the headaches are sometimes very severe. He could not say whether or not they would continue during her lifetime. Audrey Kates testified:

''Q. Do you have any headaches now? A. Yes, I have headaches real often.

''Q. How does it affect you when you have them? A. When I stoop down and raise back up, sometimes I stoop over to get something, to pick up anything and raise back up, my head starts hurting and hurts for three or four hours.

"Q. How does your head feel when you stoop down? A. It feels like there is something pressing to my head, and when I start back up, I am dizzy and go round and round."

Otherwise this girl appears to have had good health and has gained materially in weight since she left the hospital.

Dr. Henderson testified that she might later have some compression due to the bony union of fibrous tissue; that she might have some pressure on the brain later along in life and have some trouble—but he thought that this was not probable. As to any effect on her eyes, he thought that there was some danger of it, but he said that the fracture of her skull did not go far enough into the orbital region to give trouble with her eyes; and he was of the opinion that neither of her optic nerves, nor either eye, was injured at the time. She might suffer from headaches.

From all this evidence, however, it may we well inferred that this girl was permanently injured by the accident; and this evidence was not before the circuit court. It follows that the amount awarded was a grossly inadequate compensation.

If the judgment is set aside, it must, after all, be because it is to the interest of the minor. The injury was sustained under circumstances to which the rule res ipsa loquitur would apply. McHarge v. Newcomer & Co., 117 Tenn., 595, 100 S. W., 700, 9 L. R. A. (N. S.), 298; North Memphis Sav. Bank v. Union Bridge & Construction Co., 138 Tenn., 161, 177, 196 S. W., 492. The probability is that in an action regularly prosecuted, with all the facts presented, a very much larger recovery could be obtained.

In the leading case of Missouri Pacific Railway Co., plaintiff in error, v. Lasca, 79 Kans., 311, 99 Pac., 616, 21 L. R. A. (N. S.), 338, 17 Ann. Cas. 605, it was held that in an action to recover damages for personal injuries to an infant, where the proceedings in court are merely formal, and are instituted and carried on only to give an apparent sanction to a settlement agreed upon between the defendant and a parent of the infant, and there is no judicial investigation of the facts upon which the right or extent of the recovery is based, a judgment in favor of the infant entered in pursuance of the agreement and by consent merely, is only colorable and will be set aside in a proper proceeding when its effect, if allowed to stand, would be a bar to the infant's substantial rights.

While the Circuit Judge made inquiry and gave due consideration to the facts presented, he did not have before him the facts showing the proper extent of the recovery. The presentation of these facts was prevented by undue haste, by the ignorance of the mother, by the unjustifiable admission in the declaration that the injuries were not permanent, by the zeal of the defendant, and by the mistaken

purpose of the mother to receive the money. The proceeding, after all, was merely colorable, although it was not so intended by court or counsel.

The bill in this cause was filed six days after the judgment was rendered. No motion for new trial was made in the circuit court. No effort was made in that court to set aside the judgment. But the plaintiff had no counsel. Apparently there would have been serious difficulty and embarrassments had this sister as a next friend undertaken to intervene in that case. The mother was not in a clear position to attack the judgment to which she had consented. Her ignorance and negligence cannot be imputed to the minor. The fact that no fraud in fact was committed cannot affect her right to relief. The judgment would have been an absolute bar to the prosecution of her claim, and thus she would have been deprived of her full legal, rights without authority. The motive of the parties does not avoid the consequences of their act. It is a prerogative of a court of equity to afford relief against a judgment obtained under such circumstances. 34 C. J., 434. It is only when the remedy at law is adequate, complete and unembarrassed that a party is precluded from resorting to equity on the ground of a remedy or defense at law. 1 Tenn. Ency Dig., p. 192, and cases there cited.

It results that there is no error in the decree of the chancery court and it is affirmed. The costs of the appeal will be adjudged against the appellant and the surety on its appeal bond.

Faw, P. J., and Crownover, J., concur.