**James W. HARPER, Executor of the Will of Eligie C. Watkins, Sr., Plaintiff-Appellant,**

v.

**James WATKINS, Eligie Carriel Watkins, Jr., and Ferris Watkins, Defendants-Appellees.**

Court of Appeals of Tennessee, Middle Section.

Dec. 9, 1983.

Permission to Appeal Denied by Supreme Court March 19, 1984.

E.R. Woolard, Woolard & Bishop, Lebanon, for plaintiff-appellant.

Anthony E. Hagan, Lebanon, for defendants-appellees.

## OPINION

CONNER, Judge.

This is a will contest involving the five children of the decedent.

The will of Eligie C. Watkins, Sr. (Mr. Watkins, Sr.) was executed on February 12, 1979. It made his two daughters, Dovie Lee Watkins Harper and Bertha Watkins Belcher, the sole beneficiaries of his estate. Mr. Watkins, Sr., died on April 1, 1981. After the will was offered for probate by the executor thereof, his son-in-law and legally appointed conservator, James Harper, the three sons of the decedent, James Watkins, Eligie Carriel Watkins, Jr., and Ferris Watkins,[1] contested the will based

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbreviated.

upon lack of testamentary capacity at the time of execution and undue influence by the aforementioned Mr. Harper.

The issue of *divisavit vel non* was certified to the circuit court and a jury trial was conducted. Over the objection of the executor, both the questions of capacity to execute the will and undue influence were submitted to the jury. A general verdict was returned finding against the validity of the will without specification by the jury whether the basis therefor was lack of testamentary capacity or undue influence or both. Motions to set aside the verdict and seeking a new trial were overruled and this appeal by the proponent timely followed. Before us are the questions of whether there was any basis in the proof for the jury to determine that the decedent either lacked capacity at the time of the execution of the will, or if he was under undue influence.

The proponent of the will also questioned two of the instructions. However, the matter is before us on a statement of the evidence pursuant to T.R.A.P. 27(f) and no instructions of the trial court to the jury are included therein. Accordingly, we must limit our review to whether there was an evidentiary basis for the finding of lack of capacity and/or undue influence. Accordingly, we must review the relevant evidence, though lengthy, adduced at trial.

## THE BACKGROUND OF THE DISPUTE

Several unquestioned events precipitated this dispute. Some years before the events here in issue Mr. Watkins, Sr., suffered a broken back in a fall. He was crippled in the accident and was thereafter confined to a wheel chair. At his own suggestion and based upon the statements of two physicians that he was *physically* unable to manage his own affairs, Mr. Watkins, Sr., secured the appointment of Mr. Harper as his guardian on November 28, 1978. The pain from this injury was so intense at times that when present it was necessary for Mr. Watkins, Sr., to receive strong medications such as dilaudid, lioresal, valium and mandelamine. After the death of his wife, Jennie Thomas Watkins, in early 1978, a dispute developed between Mr. Watkins, Sr., and his three sons as to what disposition should be made of certain property holdings of Mrs. Watkins. The sons wanted Mr. Watkins, Sr., to waive any interest in the property in favor of all his children. He vehemently opposed such action, and the daughters sided with their father on this question. With this general family relationship the will was prepared by Calvin P. Turner, an attorney, and executed in his office by the decedent at his request on February 12, 1979, more than two years before his death.

## THE PROOF OF THE CONTESTANTS

Louise Williams was an employee of Johnson's Retirement Center, a nursing home for the elderly, generally referred to in the record as "the boarding home." Mr. Watkins, Sr., resided there during the last years of his life. Mrs. Williams regularly worked the daytime shift. Among her duties at the time was to administer medication to patients. She often gave Mr. Watkins, Sr., oral medication, but no shots, which were administered only by his daughters. Mrs. Williams testified that Mr. Watkins, Sr., would have episodes of intense pain when it was mandatory that he be given strong medication, sometimes as often as every two hours. The pain did not continue all the time, but was intermittent. Mr. Watkins, Sr., was often under the influence of medication, and in her judgment it affected his mind. Mrs. Williams stated that his mind would come and go, in keeping with the administration of the medication which she enumerated as dimarol, dilaudid, valium, codeine and Tylenol, III. She testified that when he was not suffering his daughters often came and took him for rides or to various places where he wanted to go. She said that when he was in pain and under the influence of medication, he was not able to take these trips.

She testified that on a day she could not recall, Dovie Lee Harper visited Mr. Watkins, Sr., and he left with her in her car.

Mrs. Williams said that he returned sometime before she went off duty at 5:00 p.m.; that he remarked to her that he had made his will giving everything to the girls; and that he would just let the government take care of him in the future. She testified that he appeared alert at the time he made these statements to her.

Mrs. Williams testified that she was often with Mr. Watkins, Sr., during his waking hours in the daytime; that he was taking a "lot of drugs at times—pretty often—sometimes three or four every day when having pain; that on such occasions he would sometimes hallucinate and see objects on his wall." She testified that she *considered him of unsound mind; however,* on cross-examination she qualified this judgment by saying that *"he was not like that all the time, but his mind would come and go when taking medication."* (Emphasis supplied.) It should be noted that the testimony of Mrs. Williams was the strongest evidence presented regarding the mental incapacity of Mr. Watkins, Sr.

Sue Fite was on night duty at the boarding home three nights a week and often gave Mr. Watkins, Sr., medication. She described occasions when he would be in such severe pain that he would scream and call out for medication. Mrs. Fite testified that many times it was necessary to call his daughters to give him a shot when oral medication would not give him the necessary relief. She described how these episodes of pain would appear for hours or for two or three days at a time and then would disappear, sometimes for *several days before* returning, necessitating strong medication. *She couldn't offer an opinion as to whether Mr. Watkins, Sr., was sane or insane.*

Jean Watkins, the wife of contestant James Alford Watkins, testified that her family lived for about a year in a mobile home that was parked beside the home of Mr. and Mrs. Eligie C. Watkins, Sr., and she helped both of them in various ways, as needed, and Mr. Watkins, Sr., paid her for her services. She stated that during that period they all got along well. Mr. Watkins, Sr., had previously been badly injured and often required help and care. She testified that Mrs. Watkins was in poor health at that time also, but Mr. Watkins, Sr., usually hired another person to look after Mrs. Watkins.

Jean Watkins stated that throughout the time Mr. Watkins, Sr., was in the boarding home she had seen him when she did not consider him competent. *On cross-examination she acknowledged that she was "not saying something was wrong with him all the time."* (Emphasis supplied.)

James Alford Watkins, one of the contestants, testified that both before and after the execution of the will on February 12, 1979, he visited his father at the boarding home. He testified at length about family problems involving his mother's estate and the fact that his sisters would not cooperate in signing documents that had been prepared, and that likewise his father would not sign the same.

He testified that before his mother died, his father had always been very close to him and had depended on him. He stated that he had tried to do what was best for his father in connection with his mother's estate and to give him what he wanted, but he could not be satisfied. He testified that he and his wife helped look after Mr. Watkins, Sr., for about a year before Mrs. Watkins died, and all was well between them. He stated that after his mother died and problems developed concerning her estate, Mr. Watkins, Sr., got to where he did not want to talk to him. James Alford Watkins testified that he visited his father once or twice a week, and that he often found him incoherent and hallucinating while under the influence of drugs or painkiller. On those occasions, his mind was not clear. He expressed the opinion that his father was of unsound mind.

*On cross-examination James Alford Watkins acknowledged that he was "not saying something was wrong with his mind all the time."* (Emphasis supplied.)

Ferris Watkins, another contestant, stated that he visited his father some two or three times per week, *and that on an*

*average of two out of every three visits, he found Mr. Watkins, Sr., under the influence of drugs and mentally confused.* Ferris Watkins testified that sometimes his dad appeared not to recognize him, *but on other occasions, he would recognize him and they engaged in normal conversation.* He also testified at length about the family problems that had arisen after their mother died and how his father changed and would not talk to him.

Dr. Garrett Porter, a local druggist, explained that the various drugs administered to Mr. Watkins, Sr., were very mind confusing. He explained that not all people reacted alike to the administration of these drugs and that some were affected more profoundly than others.

Charles Stevens, also a local druggist, testified to the same general effect as Dr. Porter concerning the nature of the drugs administered and their effect on the recipient. He stated that the prescriptions for Mr. Watkins, Sr., were the strongest available.

Ferrell Johnson was the owner of the boarding home where Mr. Watkins, Sr., and others in a like situation resided and received care. Mr. Johnson stated that he spends his normal working hours at the boarding home and has overall supervision of the same. He was aware of the physical condition of Mr. Watkins, Sr., and knew that from time to time heavy medication was required. *He stated that when Mr. Watkins, Sr., was under the influence of medication, his mind did not function normally. He expressed the opinion that Mr. Watkins, Sr., was of unsound mind probably 80% of the time.*

### THE PROOF OFFERED BY THE PROPONENT

Mattie Simms worked on night duty at Johnson's Retirement Center during the time that Mr. Watkins, Sr., resided there. She often saw and talked with Mr. Watkins, Sr., and gave him medication. Mrs. Simms testified that during his episodes of pain, strong medication was required, but she testified that often there were intervals when he was free from suffering and required no medication at all. These pain-free periods sometimes lasted for several days. She testified that when he was given strong painkiller, he was drowsy and was difficult to arouse. *However, she said she never saw him at any time when his condition was such that she considered him to be of unsound mind.* She saw Mr. Watkins, Sr., every night that she was on duty (three nights a week) and would often sit in his room and talk with him when her services were not required elsewhere. She stated that he always talked sensibly.

Lori Gibbs was employed as a legal secretary to attorney Calvin P. Turner on February 12, 1979. On that afternoon, Mr. Watkins, Sr., came to the office, accompanied by his daughter, Mrs. Harper. He was brought into the office in a wheel chair, and Mr. Watkins, Sr., requested to see Mr. Turner, who had previously handled some business for Mr. Watkins, Sr. Mr. Turner was busy at the time and so Mr. Watkins, Sr., sat in his wheel chair in the waiting room, talking to Ms. Gibbs and his daughter about various things. He appeared to be in a good frame of mind, cheerful and exhibiting no pain. In her opinion, he was thoroughly alert. It was some time before Mr. Turner could see him and the entire wait he conversed with both ladies. Ms. Gibbs observed no mental impairment, confusion or unusual behavior of any sort. He appeared perfectly normal to her in every way, except that he was obviously crippled. When Mr. Turner was able to see Mr. Watkins, Sr., Mrs. Harper rolled his chair into Mr. Turner's office and was in the process of leaving the room when Mr. Watkins, Sr., asked her to remain. Mrs. Harper then sat in the office during the discussion. Ms. Gibbs did not remain in the room during all of the conversation concerning the will, but she said she never heard Mrs. Harper say anything at all. She did overhear Mr. Watkins, Sr., explain to Mr. Turner in detail what he wanted in the will. Mr. Turner then called Ms. Gibbs back into his office so that he could dictate the will to her. He dictated it with some

interruptions from and discussion with Mr. Watkins, Sr. Ms. Gibbs then typed the will. Mr. Watkins, Sr., then read the will and approved it. Mr. Turner also reviewed the will after which he called his law partner, Michael W. Ferrell, into his office so that the two of them could witness the will. There was then proper execution and attestation by Messrs. Watkins, Sr., Turner and Ferrell, and Ms. Gibbs notarized the affidavit of the witnesses.

*Ms. Gibbs was of the definite opinion that Mr. Watkins was of sound mind at the time he made this will and knew exactly what he was doing.*

Michael W. Ferrell is an attorney associated with Calvin P. Turner, practicing in Mt. Juliet. He testified that on February 12, 1979, he was called into the office of Mr. Turner to witness the will of Eligie C. Watkins, Sr. He stated that Mr. Watkins, Sr., was sitting in a wheel chair at a table, and he had a document before him ready to sign. Mr. Watkins, Sr., did sign the instrument as both he and Mr. Turner watched. Then, responding to questions from Mr. Turner, Mr. Watkins, Sr., stated that the instrument was his will and asked both of them to sign it as witnesses. They complied. Mr. Ferrell engaged in some brief conversation with Mr. Watkins, Sr. at the time, but did not discuss the will or anything else at any great length. He observed nothing abnormal about Mr. Watkins, Sr., other than the fact that he was in a wheel chair. His mind certainly appeared clear and thoroughly active. *In the opinion of Mr. Ferrell he was wholly of sound mind and disposing memory at the time he signed this will.*

Calvin Turner testified that he is a practicing attorney with offices in Mt. Juliet and that he had represented Mr. Watkins, Sr., in various matters. These included the questions pertaining to the estate of the deceased wife of Mr. Watkins, Sr., and subsequent proceedings wherein Mr. Harper was appointed as conservator for Mr. Watkins, Sr., at his request because of his physical disability. Mr. Turner recounted how Mr. Watkins, Sr., had fallen from a barn some years before and suffered a broken back, disabling him from ever walking again, so that he was confined to a wheel chair or to a bed. Because he had been representing Mr. Watkins, Sr., in connection with the estate of his wife, he was well aware that there was serious friction between Mr. Watkins, Sr. and his three sons with respect to division of the property in her estate. He stated that Mr. Watkins, Sr., was very resentful because the sons were seeking to have the property handled so as to deprive Mr. Watkins, Sr. of some of his rights therein. On November 28, 1978, when the conservator was appointed Mr. Watkins, Sr., told Mr. Turner that he wanted to make a will leaving everything that he had to his two daughters because his sons had not treated him right about his wife's property, and he therefore did not want them to have anything.

As to the crucial circumstances surrounding the preparation and execution of the will, Mr. Turner testified that when Mr. Watkins, Sr., arrived at his office on February 12, 1979, he was required to wait for some time before he could be seen. When Mr. Turner was able to confer with Mr. Watkins, Sr., his daughter Dovie Harper rolled his wheel chair into a private office whereupon Mr. Watkins, Sr., told him that he had come to get his will made. At the specific request of Mr. Watkins, Sr., Mrs. Harper remained in the room. They discussed the will in detail and Mr. Watkins, Sr., repeated what he had previously said that because of the conduct of his sons in connection with the estate of their mother, he did not want them to have any of his estate at all. Mr. Watkins, Sr., stated that he wanted to give all his holdings to his two daughters, and that he wanted his son-in-law, James W. Harper, to serve as the executor. According to Mr. Turner, Mr. Watkins, Sr., was talking freely, lucidly and emphatically regarding what he wanted done. Mr. Turner stated that he observed no abnormal actions, expression or statements, and that Mr. Watkins, Sr., was perfectly rational in every respect. He was not drowsy and did not appear to be

under the influence of any sedative. Mr. Turner then wrote the will exactly as directed by Mr. Watkins, Sr., after which both men carefully examined the document and Mr. Watkins, Sr., approved it. Mr. Turner then called Mr. Ferrell into his office and the will was then properly executed by Mr. Watkins, Sr., and witnessed by Messrs. Turner and Ferrell. *Mr. Turner was emphatic that Mr. Watkins, Sr., was entirely of sound mind and disposing memory on this occasion.* He stated that Mrs. Harper made no comment or suggestions, nor made any request or gave any directions of any sort. She merely sat and listened.

Mr. Turner testified further that in the following summer, certain of the legal problems involving the estate of Mrs. Watkins were worked out through appropriate court proceedings in a manner satisfactory to Mr. Watkins, Sr. Having heard that the sons were taking the position that their father was of unsound mind and wanting to be certain that he was mentally competent and capable of entering into these transactions, Mr. Turner went to the boarding home to see Mr. Watkins, Sr., on August 24, 1979. *On that occasion, he talked at length with Mr. Watkins, Sr., and found him rational and in a normal frame of mind.* He said that Mr. Watkins, Sr., talked sensibly and understandably. Immediately following his visit with Mr. Watkins, Sr., Mr. Turner prepared a memorandum which he dated and signed concerning his visit. It read:

AUG 24, 1979

Came to Ferrell Johnson Boarding house to see Mr. Watkins. He was asleep when I came in. I called his name, and he answered. I called his name again and he woke and raised up on an elbow. He talked as well as anyone. He knows where he is. Says food is good here. Says his sons came to see him today and discussed closing the estate. He talked about his Dr., a Dr. Meacham in Nashville. He talked about serving on Jury duty 2 times in one year and then being called 3rd time and being released. He talked (sic) Atty. Louis Chambers. I

asked if he knew that Senator Chambers was dead and he said "yes, I heard that they found him dead out at the barn". Mr. Watkins says he is agreeable with the settlement as outlined. *In my opinion Mr. Watkins' mind is as sound as any of his children or either of the lawyers involved in the case.*

Calvin P. Turner

Upon preparing to leave, Mr. Watkins took my hand and prayed a beautiful prayer that was real inspiration to me.

(Emphasis supplied.)

Robert P. Hamilton, a Lebanon attorney, testified that he was named as the guardian *ad litem* for Mr. Watkins, Sr., in the conservator proceedings. He testified that because this action was being taken at request of Mr. Watkins, Sr., and because he desired to name his own conservator, Mr. Hamilton wanted to be thoroughly certain that he was competent in this regard. Therefore, at the hearing Mr. Hamilton privately talked to Mr. Watkins, Sr., at length. He concluded that Mr. Watkins, Sr., was in full possession of his faculties, "discussing the matter in a most impressive way and expressing precisely his reasons for seeking this action." Mr. Watkins, Sr., stated that because of his physical condition, it was no longer possible for him to handle his business affairs as they should be; that he wanted someone to help him, and to have the necessary authority to act in his behalf when he was unable to do this for himself. Mr. Watkins, Sr., expressed full confidence in his son-in-law, James W. Harper, and told the guardian *ad litem* that he wanted Mr. Harper to serve as conservator. *Mr. Hamilton expressed the opinion that Mr. Watkins, Sr., was definitely of sound mind on that occasion.*

Janet Hall testified that she is a registered nurse employed by Physicians' Health Care Services, Inc. of Lebanon. It was a part of her duty to visit and minister to Mr. Watkins, Sr., and others in the boarding home. She made physical examinations on each visit and maintained

records of her findings. Based upon these records, she testified that Mr. Watkins, Sr., had periodic attacks of severe pain when he would require strong medication. She recited that many times when he was not in pain he left the home and remained away for hours or perhaps all day. *She testified that she never at any time found Mr. Watkins, Sr., when he was not alert, even though on some of those occasions he had received medication.* She said she could not say that he was ever of unsound mind. Ms. Hall said that she started making her visits to see him beginning the second week in January of 1979 and continuing until his death. She stated that someone from the Physicians' Health Care Service would visit the home and see Mr. Watkins, Sr., some four times per week. She always saw him herself at least once a week, at which time she made a complete examination and made a record of it. She referred to the records to show that someone who preceded her in making these visits had made six different entries throughout the month of December, 1978, and one entry on January 2, 1979, that Mr. Watkins, Sr., was "not alert." Ms. Hall testified that she never found him when he was not alert prior to the period of his terminal illness resulting in his death on April 1, 1981. Beginning with the second week in January, 1979, and continuing for a period of some four months, all of the records prepared by Ms. Hall showed Mr. Watkins, Sr., to be alert, even when under sedation. She explained that the periodic excruciating pain which he suffered came from muscle spasms in his back.

Edward Kirkpatrick testified that he is a retired employee of the U.S. Labor Department and was a neighbor of Mr. Watkins, Sr., until he was forced into the boarding home because of his physical condition. He had been well acquainted with Mr. Watkins, Sr., for years. Mr. Kirkpatrick testified that one evening he was in a funeral home in Lebanon paying his respects because of the death of another neighbor, Anna Wright. While he was there Mr. Watkins, Sr., was brought into the funeral home in his wheel chair by his daughter Dovie Lee Harper, and her husband, James

W. Harper. Mr. Watkins, Sr., spent some time in the funeral home, laughing and talking with friends. Mr. Kirkpatrick engaged in a lengthy conversation with Mr. Watkins, Sr., on that occasion. He stated that Mr. Watkins, Sr., was in a rather jolly frame of mind, not in any apparent pain, and appeared to be thoroughly enjoying the visit with so many of his old friends and former neighbors. *He said that Mr. Watkins, Sr., talked with all intelligence, and there were no signs or indications of any kind that his mind was other than normal. Mr. Kirkpatrick further stated that he had seen Mr. Watkins, Sr., on other occasions since his confinement to the boarding home, but that he had never found him to be anything other than rational and of sound mind.*

James W. Harper, the husband of Dovie Lee Watkins Harper, and the son-in-law of Mr. Watkins, Sr., testified that he had helped Mr. Watkins, Sr., extensively in connection with his business affairs, and Mr. Watkins, Sr., came to be very dependent upon him. Because of the increasing years of Mr. Watkins, Sr., and the worsening of his physical disability, Mr. Watkins, Sr., decided on his own initiative that he wanted Mr. Harper to serve as his conservator. Mr. Watkins, Sr., then asked Mr. Harper to take him to the office of Calvin Turner to prepare the proper papers for a conservatorship and the son-in-law complied. Mr. Turner explained to both that a person who is in possession of his mental faculties has the right, under the directions of the court, to name a conservator to help him in the event of physical disability. Mr. Watkins, Sr., then directed that the necessary documents be prepared, and thereafter, Mr. Harper was appointed the conservator. Mr. Watkins, Sr., requested and received the right to issue checks if he desired. Mr. Harper stated that one of the reasons motivating Mr. Watkins, Sr., in having Mr. Harper appointed his conservator was the fact that a serious problem had developed in the family over the property left by the recently deceased wife of Mr. Watkins, Sr. Mr. Watkins, Sr., wanted his full share of the

property, as provided by law, but his sons insisted that he divest himself of all property rights and receive Medicaid. Mr. Watkins, Sr., strenuously resisted this position and was most resentful. Mr. Harper testified that Mr. Watkins, Sr., and his sons could not reach an understanding about this matter, and he realized that his physical condition would not allow him to get around and see about the situation as he realized would be necessary. For that reason, he wanted someone with authority to assist him. The tension between Mr. Watkins, Sr., and his sons grew worse all the time and Mr. Watkins, Sr., felt that he was being grossly mistreated by them. The two daughters sided with their father, insisting that if he desired he should have set aside to him the full share of their mother's estate allowed by law.

Mr. Watkins, Sr., suffered from a broken back, sustained some years before, which prevented him from ever walking again. He had periodic attacks of severe pain from back spasms necessitating medication. These attacks would sometimes last for two or three days, finally clearing up so that on occasions he would be free of pain. In this state Mr. Watkins, Sr., felt good and liked to have his daughters take him out and ride him around as often as possible. Dovie Lee Watkins Harper often took him to their home where he would spend the day before returning in the evening. Mr. Harper testified that he had never seen Mr. Watkins, Sr., when he was not aware of everything going on about him. However, he stated that many times he had seen Mr. Watkins, Sr., when he was very drowsy and therefore might even be difficult to arouse; and when aroused, he would not be very talkative. *Yet in Mr. Harper's opinion, on those occasions when he was free of pain, and therefore free of medication, he was as rational as any person.*

Mr. Harper testified that he learned of the will on the day Mr. Watkins, Sr., made it. He said that he did not know in advance that Mr. Watkins, Sr., was going to do this. Upon returning home from work that night Mr. Harper found Mr. Watkins,

Sr., at his home. He said that Mr. Watkins, Sr., obviously felt well and was in no pain. In Mr. Harper's opinion he clearly was not under the influence of any medication, but was in a very happy frame of mind, laughing and talking, and appearing to be thoroughly enjoying the visit. Mr. Watkins, Sr., ate the evening meal with the Harpers, and following dinner, they decided that they should visit the funeral home to pay their respects to a friend who had died, Anna Wright. He said that after he and his wife had bathed and dressed, they all three went to the funeral home, arriving there at somewhere between 7:00 and 8:00 o'clock p.m. Mr. Watkins, Sr., appeared to be most happy to discover that some of his old friends and acquaintances were there. Naturally, he visited with them. In particular, Mr. Watkins, Sr., engaged in conversation with Edward Kirkpatrick. He stated that sometime, probably after 8:30 p.m., they left the funeral home and returned Mr. Watkins, Sr., to the boarding home, arriving there at about 9:00 p.m. Louise Williams was not on duty at that time. Mr. Harper stated that he had heard Mrs. Williams' testimony that she talked with Mr. Watkins, Sr., as he returned after having the will made. He stated that this did not occur, noting that Mrs. Williams' duty hours terminated at 5:00 p.m.

Mr. Harper testified that Mr. Watkins, Sr., told him while at his home earlier that evening that he had made his will that day, and that he had named him as Executor. This was the first that Mr. Harper knew of any will, and said he had never heard it mentioned by anyone before that time. Mr. Harper stated that he most certainly had never suggested to Mr. Watkins, Sr., that he should make a will of any type whatsoever. Nor did he know of anyone else in the family who made such a suggestion. *In his opinion Mr. Watkins, Sr., was definitely of sound mind on that night and knew exactly what he was doing.* On that occasion Mr. Watkins, Sr., delivered the will to him for safekeeping.

*Based on Mr. Harper's observations Mr. Watkins, Sr., continued to know and un-*

*derstand everything fully and completely up until a few weeks immediately preceding his death on April 1, 1981, when his mind did become foggy, and he was not always rational.* Mr. Harper further testified that neither he nor anyone else, to his knowledge, influenced, persuaded or asked Mr. Watkins, Sr., to make the will or to give all his property to his daughters.

Dovie Lee Harper testified that she is a daughter of the decedent and the wife of James W. Harper, the executor of the will of Mr. Watkins, Sr. She was well acquainted with the nature, extent and effect of her father's injury and resulting disability. His condition and that of his wife had deteriorated to the point that they both decided they would voluntarily enter the "Nursing" facility or "boarding home," operated by Ferrell Johnson, where the elderly were housed and received care. Mr. Watkins, Sr., would have bad spells of pain necessitating the administration of very strong medication in order to keep him comfortable. Since no one at the boarding home was allowed to give him shots, either Mrs. Harper or her sister were often called to come give him a shot when the suffering was extreme. These periods of pain would come and go, sometimes several days of pain and then several days of relief. When free of pain, he took no medication at all and always wanted to leave the home and go visit some of his friends, or perhaps just ride around. Mrs. Harper stated that her sister, Bertha Watkins Belcher, worked five days per week so she was the one that most often took him out of the home for these trips or rides. This was done quite often and was a regular custom until the last weeks of his life when he became so ill that he could not very well be moved from his bed. Mrs. Harper stated that she saw her father virtually every day and sometimes more than once each day; always either she or her sister would visit him one or more times each day. *Mrs. Harper stated that she never saw her father when she did not consider him of wholly sound mind until the last few weeks of his life.*

Regarding the execution of the will, Mrs. Harper testified that at about 9:00 a.m. on February 12, 1979, she went to the boarding home to visit her father. Mr. Watkins, Sr., was feeling well. He said that he wanted her to take him to the office of Calvin Turner so that he could make his will. She was a little surprised at this request because he had not mentioned it to her before, but she had intended to take him out if he wanted to go so she did take him. They first went to her home, where they remained for some time until Mr. Turner could see them, which was well into the afternoon. During the hours that intervened Mr. Watkins, Sr., apparently enjoyed the visit and was in a cheerful frame of mind. No pain was apparent and during the whole time he did not receive any medication. Mrs. Harper took him to the attorney's office, where they sat and talked for some time with the secretary. When Mr. Turner could see them, she rolled her father into his office. She was about to leave when her father stated he wanted her to stay. Accordingly, she remained until the will was signed. Mrs. Harper's testimony, entirely consistent with that of Mr. Turner and his secretary, was that her father explained everything in detail to Mr. Truner, with no suggestions or help from her. Mr. Turner dictated the will, after which it was reviewed and executed. Thereafter, they left the office and returned to Mrs. Harper's home. She prepared the evening meal, and after her husband arrived from work, they all ate together. They then decided to visit the funeral home to pay their respects to Anna Wright. Upon arrival Mr. Watkins, Sr., began to greet and converse with some of his old friends and acquaintances already there. Among those with whom Mr. Watkins, Sr., visited was Edward Kirkpatrick, a close friend for many years. After this, they took Mr. Watkins, Sr., back to the boarding home, arriving there at about 9:00 p.m. She says that Mrs. Williams was not present when they returned.

Mrs. Harper testified that she did not in any way influence her father to make this will or to give his property to her and her sister. Mrs. Harper denied even mention-

ing such a thing to him. She says that the will was done entirely of his own initiative; further that she did nothing, and had no reason to believe that either her husband or her sister, or anyone else so much as suggested to Mr. Watkins, Sr., that he should make his will or how he should dispose of his property.

Regarding the family situation involving her mother's estate Mrs. Harper stated that her father was greatly angered at her three brothers because of their attempt to deprive him of his share. There were certain documents prepared for the sale of the land, but since the arrangements did not meet with their father's approval, he refused to sign these papers. Mrs. Harper and her sister likewise refused to sign the documents because their father had refused. She says that neither she nor her sister led their father in this refusal. That was his own decision. They did not try to persuade him to sign them because he was not happy with the arrangement. On their part, they resented their brothers' efforts to deprive their father of his share.

Mrs. Harper stated that her father was a strong-willed person and sometimes very stubborn and determined to have his own way.

Bertha Belcher testified that she is a sister of Dovie Lee Harper, a daughter of Eligie C. Watkins, Sr., and one of the two beneficiaries named in his will. She made substantially the same statements as her sister with respect to her father's condition, physically and mentally, and with respect to the land transaction involving their mother's estate.

*She testified positively that her father was of sound mind at and during the time period when he made the will, and at all times before and after that date until perhaps three months prior to his death in April of 1981. Mrs. Belcher testified that she did not see her father on the day the will was written, but probably the day before and/or the day after, at which time Mr. Watkins, Sr., was of sound mind.*

## THE UNDUE INFLUENCE QUESTION

As can be gleaned from the proof detailed above, there is no evidence of undue influence apparent in this record. Therefore, the only way a verdict based thereon could stand[2] would be if under these circumstances there exists a presumption of invalidity which alone would suffice.

Four cases involving "undue influence" of relatively recent vintage set forth principles which we believe are here controlling. They are *Kelly v. Allen*, 558 S.W.2d 845 (Tenn.1977), *Richmond v. Christian*, 555 S.W.2d 105 (Tenn.1977), *Taliaferro v. Green*, 622 S.W.2d 829 (Tenn.App.1981), and *Parham v. Walker*, 568 S.W.2d 622 (Tenn.App.1978).

In *Kelly v. Allen* Justice Henry stated:

First we recognize it to be law in this jurisdiction that it is not *influence* that invalidates a conveyance or will but *undue influence;* that "[a] person has a right by fair argument or persuasion to induce another to make a will [sign a deed], and even to make it in his own favor," provided the influence is "exerted in a fair and reasonable manner, and without fraud or deception." Phillips' *Pritchard on Wills*, Sections 130, 131; *Halle v. Summerfield*, 199 Tenn. 445, 287 S.W.2d 57 (1956). In *Halle*, the Court cited with apparent approval the case of *Solari v. Albertine*, 29 Tenn.App. 61, 193 S.W.2d 111 (1945), and with respect thereto noted: [Emphasis in original.]

"It was there held that mere proof of a confidential relationship "does not raise the presumption that the beneficiary has exercised undue influence over the testator and cast upon her the burden of disproving undue influence"; (citation omitted) that is in the absence

---

**2.** It is impossible to tell whether undue influence was the basis for the verdict. The form used by the jury stated: "We, the jury, unanimously find _____ the Will." Inserted in longhand in the blank space was the word "AGAINST." The only other writing was the signature of the foreman.

of a showing of some activity on the part of the beneficiary in connection with the preparation or execution of the will." 199 Tenn. at 455, 287 S.W.2d at 61.

. . . .

Again, in *Halle*, the Court quoted from A.L.R. with approval:

It is settled that the mere fact that one who benefits by a will had a motive and an opportunity to exert influence over the testator is not sufficient, *of itself, to create a presumption that the will was the product of undue influence.* 199 Tenn. at 456, 287 S.W.2d at 62. [Emphasis in original.]

The landmark case of *Turner v. Leathers*, 191 Tenn. 292, 232 S.W.2d 269 (1950), phrases the general rule in terms of abuse of confidence and the exercise of "dominion and influence" as opposed to the mere existence of the confidential or fiduciary relationship.

In *Peoples Bank v. Baxter*, 41 Tenn. App. 710, 298 S.W.2d 732 (1956), the criterion is framed in terms of a confidential relationship between a "dominated" party and a "dominating" party. *See also Mahunda v. Thomas*, 55 Tenn.App. 470, 402 S.W.2d 485 (1965).

In *Vantrease v. Carl*, 56 Tenn.App. 636, 643, 410 S.W.2d 629, 632 (1966), the Court recognized that a mere confidential relationship "does not raise a presumption that the beneficiary has exercised undue influence over the testator and does not cast the burden on the beneficiary of disproving undue influence."

And in *Iacometti v. Frassinelli*, 494 S.W.2d 496, 499 (Tenn.App.1973), the Court held that "[p]roof of the existence of the normal family relationship between a parent and adult child, standing alone, does not give rise to an inference or presumption that either one exercises any dominion and control over the other."

In *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn.App.1974), the Court of Appeals for the Eastern Section, makes

it clear that "the relationship of parent and child does not, per se, create a confidential relationship," and "does not raise a presumption that a deed from the parent to the child is invalid."

Finally, in our recent case of *Richmond v. Christian*, 555 S.W.2d 105 (Tenn.1977), we applied the presumption on the basis of a gift made to a "dominant party" and under a factual situation making independent advice mandatory.

*In line with these authorities we hold that the normal relationship between a mentally competent parent and an adult child is not per se a confidential relationship and raises no presumption of the invalidity of a gift from one to the other. In order for such a presumption to arise there must be a showing that there were present the elements of dominion and control by the stronger over the weaker, or there must be a showing of senility or physical and mental deterioration of the donor or that fraud or duress was involved, or other conditions which would tend to establish that the free agency of the donor was destroyed and the will of the donee was substituted therefor.* In such cases the rules require the application of the presumption and the rule of independent advice comes into play.

*These rules, of course, are not applicable in those cases where a fiduciary relationship exists, e.g., guardian and ward, trustee and cestui que trust, or any other relationship where the law prohibits gifts or dealings between the parties.* We, therefore, restrict this holding to the parent-child relationship.

558 S.W.2d at 847–48 (emphasis supplied, unless otherwise indicated).

In *Richmond v. Christian* our supreme court through Justice Brock spoke directly to the requirements in cases where "the presumption of invalidity" exists.

It is well established that when two parties enter into a confidential or fiduciary relationship and the dominant party receives a gift or other benefit from the other party a presumption arises that

some improper advantage was taken "... either of the confidential relation existing ... or of the weakness and frailty of the party from whom the benefit was received, ..." thus rendering the transaction invalid. *Graves v. White,* 63 Tenn. 38, 4 Baxt. 38 (1874); *Turner v. Leathers,* 191 Tenn 292, 232 S.W.2d 269 (1950); *Roberts v. Chase, et al.,* 25 Tenn. App. 636, 166 S.W.2d 641 (1942); *Hollis v. Thomas,* 42 Tenn.App. 407, 303 S.W.2d 751 (1957).

The presumption of invalidity, however, is rebuttable and the rule in this State is that clear and convincing evidence of fairness will suffice. Proof that the donor received independent advice respecting the consequences and advisability of the gift is one example, but not the only one, of such proof of fairness. *Roberts v. Chase, supra; Peoples Bank v. Baxter, et al.,* 41 Tenn.App. 710, 298 S.W.2d 732 (1956); See also *Hester v. Hester,* 81 Tenn. 189, 13 Lea. 189 (1884).

Independent advice is ordinarily required where it is a reasonable requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice, particularly, where the donor is impoverished by the gift in question or the gift seems to be unnatural under the circumstances of the case. *Miller v. Proctor,* 24 Tenn.App. 439, 145 S.W.2d 807 (1940); *Roberts v. Chase, supra; Hollis v. Thomas, supra.*

In *Roberts v. Chase, supra,* Mr. Justice Felts explained that the strength of the presumption of invalidity varies with the circumstances of each case and, therefore, that the strength of the rebutting evidence must vary proportionally:

"The circumstances of some transactions are such that the only way in which the fiduciary can rebut the presumption of invalidity is by showing that his principal had the benefit of independent advice (citations omitted). Mr. Pomeroy says:

'The question as to whether such independent advise is essential is ordinarily determined with respect to the nature of the confidence reposed, the nature of the transaction and the circumstances in each particular case. In other words, a rule requiring proof of independent advice is ordinarily applied where it is a necessary requirement and where the circumstances are such that it would be difficult to show the fairness of the transaction without proof of independent advice....

(Quoting 3 POMEROY'S EQUITY JURISPRUDENCE, § 956b at 797–798 [5th ed. 1941].) ... 166 S.W.2d 641, 651.

. . . .

We reaffirm the rule that proof of independent advice is not essential in every case to rebut the presumption of invalidity which arises when the dominated party in a fiduciary or confidential relation makes a gift or confers a benefit to the dominant party ....

. . . .

*Courts should exercise the utmost care and caution before concluding that the solemn act of a decedent, such as execution of a deed or will, should be invalidated; but, it is equally important that they be vigilant to prevent imposition upon those who are weak, frail, and vulnerable to the influence and importunities of others who exercise a dominant position over them.*

555 S.W.2d at 107–09 (emphasis supplied).

In *Parham v. Walker,* the western section of this court was required to deal with the burden of proof in will contests based upon lack of mental capacity and/or undue influence under this situation:

[T]estatrix Edna Arnold Caulton became acquainted with the Reverend Isiah Rowser in 1965. At the time the testatrix was approximately 80 years of age with no immediate family. Her estate consisted principally of her homeplace (a modest dwelling) and two valuable commercial lots occupied by a gasoline service station which she had inherited and from which she received a monthly income.

On May 29, 1973, over objection of counsel for Edna Arnold Caulton's relatives, Isiah Rowser was appointed conservator of her estate and remained as such until her death.

On May 30, 1974, Edna Arnold Caulton executed the formal writing styled "LAST WILL AND TESTAMENT OF EDNA ARNOLD CAULTON" which instrument is the subject of this controversy. By this instrument Caulton left everything to her conservator Rowser and named him as executor. The 1974 will recites the reason for leaving everything to Rowser as "in consideration of the care and attention he has shown me and the services he has rendered to me and on my behalf, all of which has been lacking on the part of my relatives."

Edna Arnold Caulton died on May 25, 1975.

Notice of contest of the will was filed and the matter was transferred from the Probate Court of Shelby County to the Circuit Court of that County for a trial on the issue of *devisavit vel non*. Proof pro and con regarding the mental testamentary capacity of the testatrix was adduced as well as proof tending to show the existence or nonexistence of a confidential relationship between the testatrix and Rowser.

568 S.W.2d at 623.

We will deal with the lack of mental capacity at p. 628, *infra*. However, on the question of undue influence Judge Nearn said:

Of course, should a jury in a case where both of these issues were present, find the deceased to be of unsound mind, the issue of undue influence is never reached.

Undue influence presupposes a mind of testamentary capacity. Acts of insane minds or minds lacking testamentary capacity are void regardless of influence, undue or not.

It is not influence upon a capable mind that is prohibited. It is the *undue* influence thereof which is the subject of judicial condemnation. *Patterson v. Mitch-*

*ell* (1929 M.S.) 9 Tenn.App. 662. For the doctrine of undue influence to be applicable there must be a confidential relationship in existence whereby one party (donee-grantee-beneficiary) is in a position, because of the confidential relationship, to exercise undue influence over the mind and will of the other (donor-grantor-testator). *Turner v. Leathers* (1950) 191 Tenn. 292, 232 S.W.2d 269. The burden is upon the one who alleges the existence of such a confidential relationship to prove it. *In re Estate of Rhodes* (1968) 222 Tenn. 394, 436 S.W.2d 429. Once its existence is proven, undue influence is presumed and the recipient must prove an exception to the presumption by carrying the burden of showing the fairness of the transaction and the non-existence of the presumed undue influence. If the recipient fails in that burden, the transaction is presumed void. *Miller v. Proctor* (1940 M.S.) 24 Tenn.App. 439, 145 S.W.2d 807. There are recognized ways to disprove the existence of undue influence such as independent, competent advice, but they need not here be discussed. *Lyman v. American Nat'l Bank & Trust Co.* (1960 E.S.) 48 Tenn. App. 328, 346 S.W.2d 289. [Emphasis in original.]

It should be noted that the Trial Judge evidently relied upon certain statements found in Phillips' Pritchard on the Law of Wills and Administration of Estates (3rd Ed.1955) and such cases as *Vantrease v. Carl* (1966 M.S.) 56 Tenn.App. 636, 410 S.W.2d 629 and *Thomas v. Hamlin* (1964 W.S.) 56 Tenn.App. 13, 404 S.W.2d 569, as authority for instructing the jury that the existence of a confidential relationship did not raise a presumption that the beneficiary had exercised undue influence and did not cast the burden on the beneficiary of disproving undue influence. The essence of the holding in *Thomas v. Hamlin* was that, under its facts, whether or not a confidential relationship existed between testatrix and beneficiary was a matter for jury determination. It is a lengthy Opinion, but as we read it, that is all it holds. *The*

*deceased, while under conservatorship, drafted a will leaving her estate to a relative. She did not leave her estate to her conservator. Therefore, the Court never reached the issue of the confidential relationship created by the conservatorship and the presumptions that flow therefrom.* The Court in *Thomas v. Hamlin* recognized that it is natural to leave one's estate to relatives and it is also natural that a relationship of confidence exists between relatives, and that proof of the natural relationship of relatives did not establish *per se* the confidential relationship in law which raised the presumption of invalidity. Whether the blood relationship plus other facts constituted the legal confidential relationship was for jury determination. To the same effect was the holding in *Vantrease v. Carl.* Most recently, our Supreme Court in the case of *Kelly v. Allen,* 558 S.W.2d 845, ... reiterated the distinctions between the confidentiality inherent in natural blood relationships and legal "confidential relationships". In that case the Court held that in order for the presumption of invalidity to rise in transactions between close family members, not only must the natural confidential relationship be present, but there must be an additional showing of the presence of the elements of dominion and control by the stronger over the weaker or other conditions to establish the destruction of the free agency of the donor. The Court then stated that these rules (requiring more than establishment of confidential relationships) "are not applicable in those cases where a fiduciary relationship exists, e.g., guardian and ward, trustee and cestui que trust, or any other relationship where the law prohibits gifts or dealings between the parties."

The relationship of conservator-ward is one of those cases where the "additional showing" rules are not applicable and the Trial Court erred instructing the jury that the burden of disproving undue influence was *not* on the beneficiary. [Emphasis in original.]

In this case the proof shows that the legal relationship of conservator-ward existed between the beneficiary and testatrix at the time of the execution of the 1974 will. We hold that such a Court established relationship is a confidential relationship in law and in fact. Proof of a Court ordered relationship of conservator-ward is not proof of lack of testamentary capacity, but it is proof of a confidential relationship. The conservator is under bond to faithfully perform. The control of the conservator is absolute unless limited by the Court. Section 34-1012 T.C.A. prescribes the duties and powers of a conservator as those of a guardian of a minor. The Trial Court should have charged the jury that a confidential relationship did exist between the testatrix and will beneficiary as a matter of law and the burden was upon the will beneficiary to show the fairness and honesty of the transaction and to negate the presumption of undue influence.

568 S.W.2d at 624–25 (emphasis supplied, unless otherwise indicated).

Finally, in *Taliaferro v. Green* Judge Lewis, speaking for this court, stated:

In a will contest the initial burden is upon the proponent of the will to show its prima facie validity and this is a question for the determination of the court. Upon the proponent's satisfactorily showing prima facie validity, the burden shifts to the contestant and, generally, the burden is upon the contestant to show facts relied upon to void the will. *Keys v. Keys,* 23 Tenn.App. 188, 129 S.W.2d 1103 (1939); *Cf. Burrow v. Lewis,* 24 Tenn.App. 253, 260–61, 142 S.W.2d 758, 762–63 (1940)....

....

... As a general rule it is presumed that neither fraud nor undue influence entered into the making of a will and ordinarily the contestant who alleges fraud or undue influence has the burden of proof on these issues. *Hammond v. Union Planters National Bank,* 189 Tenn. 93, 222 S.W.2d 377 (1949); *Haynes*

*v. Mullins,* 30 Tenn.App. 615, 209 S.W.2d 278 (1947). Where, however, the contestant shows the existence of suspicious circumstances such as a confidential relationship in combination with the beneficiary's involvement in procuring the will, or in combination with impairment of the testator's mental capacity, there arises the presumption of fraud or undue influence which the proponent of the will must overcome by a preponderance of the evidence. *Halle v. Summerfield,* 199 Tenn. 445, 287 S.W.2d 57 (1956); *Thomas v. Hamlin, supra; Kelley v. Brading, supra.*

The Greens, relying on *Brown v. Hows,* 163 Tenn. 138, 40 S.W.2d 1017 (1931), an election of contest case, insist that once sufficient evidence has been presented to raise the presumption of undue influence, the introduction of any credible evidence to the contrary meets the proponent's burden of proof and "[t]hereafter, if a contestant fails to introduce further evidence regarding undue influence, the will must be upheld." We disagree.

"The presumptions which arise on the showing of a personal or confidential relation, together with suspicious circumstances, are presumptions of fact which may be rebutted. However, the effect of such rebutting testimony is not to make the presumption disappear but to raise an issue for the jury." 94 C.J.S. *Wills* § 239. The type of presumption discussed in *Brown v. Hows, supra,* was an example of what are known as bare or arbitrary presumptions, which are to be distinguished from presumptions which arise from facts through a process of logical inference. *Southern Motors, Inc. v. Morton,* 25 Tenn.App. 204, 213, 154 S.W.2d 801, 806 (1941); *see also Bryan v. Aetna Life Insurance Co.,* 174 Tenn. 602, 613, 130 S.W.2d 85, 89 (1939); *Bryan v. Aetna Life Insurance Co. No. 4,* 25 Tenn.App. 496, 501, 160 S.W.2d 423, 426 (1941).

Under the practice in this state the burden of proof, in its usual and primary meaning, as the risk of nonpersuasion of the trier or triers of fact, never shifts, but remains throughout the trial where it was in the first instance. The burden of producing evidence may, however, shift from time to time in the course of the trial. One way in which this is brought about is by means of presumptions which the law raises upon proof of certain facts; that is to say, in some instances the law attaches to a given state of facts certain procedural consequences with respect to the duty of producing countervailing evidence by an opponent. A learned discussion of the subject is to be found in the leading case of *North Memphis Savings Bank v. Union Bridge & Construction Co.,* 138 Tenn. 161, 196 S.W., 492. See also, *Shockley v. Morristown Produce & Ice Co.,* 158 Tenn., 148, 11 S.W.(2d), 900; *Lewis v. Casenburg,* 157 Tenn., 187, 7 S.W.(2d) 808, 60 A.L.R., 254; *Whipple v. McKew,* 166 Tenn., 31, 60 S.W.(2d), 1006.

The "effect of a presumption 'of law' (that is the real presumption)" says Dean Wigmore in his treatise on Evidence, "is merely to invoke a rule of law compelling the jury to reach the conclusion in the absence of evidence to the contrary from the opponent." 5 Wigmore on Evidence (2 Ed.), Sec. 2491. But it is important to know that a presumption of this kind adds nothing to the probative force of the facts that give rise to it and when its purpose has been accomplished, that is, when the party against whom it is raised has produced countervailing evidence, the presumption disappears and the question for decision then is whether the preponderance of the evidence with respect to the determinative issue or issues is with the party who had the burden of proof in the first instance. *Whipple v. McKew,* supra; see *Central of Georgia Railway Co. v. Fuller Combing Gin Co.,* 2 Tenn.Civ.App. (2 Higgins), 343.

As the Court very aptly observed in *Frank [v.] Wright,* 140 Tenn., 535, 548, 205 S.W., 434, 437, presumptions are raised to take the place of proof and "where the proofs are present there is neither foundation nor room for the presumption."

*Illinois Central Railroad Co. v. H. Rouw & Co.,* 25 Tenn.App. 475, 479–80, 159 S.W.2d 839, 842–43 (1940). Thus, upon finding the existence of a confidential relationship in combination with one or more of the other necessary elements, the jury is required to find undue influence as well, unless the proponent has come forward with other evidence to the contrary. If the proponent has come forward with such evidence, the presumption, in the sense that it is conclusive, drops out, as the Greens say, but the consequence is not that "the will must be upheld," but that "the question for decision then is whether the preponderance of the evidence with respect to the determinative issue or issues is with the party who had the burden of proof in the first instance." *Id.* at 480, 159 S.W.2d at 843.

*It is enough to create the presumption if it is shown that the beneficiary had a confidential relationship with the testator and was active in connection with the preparation or the execution of the will. Halle v. Summerfield,* 199 Tenn. at 455, 287 S.W.2d at 61. *If the beneficiary's role is confined to that of a mere messenger between the testator and the testator's attorney, the presumption will not arise. Avant v. White* (Court of Appeals, Middle Section, filed at Nashville March 29, 1974, unreported). But this rule does not apply where there has been any activity directly connected with the actual execution of the will.

622 S.W.2d at 835–37 (emphasis supplied).

We believe the effect of all these decisions is to tell us that in this case there was no presumption of undue influence—or if there was it was overcome by the clear, cogent and convincing proof of the circumstances surrounding the making by Mr. Watkins, Sr., of his will which suggested absolutely no undue influence by anyone.

■ We will be more specific. The complaint only alleged undue influence by Mr. Harper. Even though he was the conservator of Mr. Watkins, Sr., we see no basis for the ultimate existence of the presumption because:

(1) The conservator was not a beneficiary under the will of Mr. Watkins, Sr. *See Taliaferro,* 622 S.W.2d at 837; *Parham,* 568 S.W.2d at 624.

(2) The conservator had absolutely no role in the making of the will. *Taliaferro,* 622 S.W.2d at 837. He was not even a "messenger," *Id.,* and according to the uncontroverted proof, did not even know anything about the will until after it had been made.

(3) This record is completely devoid of any actual "dominion and control" by Mr. Harper over Mr. Watkins, Sr. He was named conservator some three months before the making of the will at the request of Mr. Watkins, Sr., and not because of any mental disability, but solely because of physical impairment. These facts were verified by the most independent of third parties, a guardian *ad litem,* Mr. Hamilton, an attorney and officer of the court, expressly appointed to investigate the situation before Mr. Harper was named as the conservator of Mr. Watkins, Sr.

(4) There are simply no "suspicious circumstances" apparent here surrounding the making of the will or the reason three of the children were excluded. The will was prepared by Mr. Turner, the lawyer of Mr. Watkins, Sr., not the lawyer for Mr. Harper or any other family member, again at the specific request of the testator. Mr. Turner indicated no surprise that Mr. Watkins, Sr., would exclude his three sons from the will because of his awareness of the bitterness of Mr. Watkins, Sr., toward them arising out of the conflicts surrounding division of the estate of Mrs. Watkins at her death.

■ As to the beneficiaries under the will, Mrs. Harper and Mrs. Belcher, from

this record we are not certain there was even a pleading of undue influence. There was no suggestion thereof in the record or in the defendant's brief. However, out of an abundance of caution we will touch upon that possibility as to the daughters. We reiterate that the relationship of parent and child standing alone does not create a confidential relationship, the first requisite toward the presumption of undue influence. *Kelly v. Allen*, 558 S.W.2d at 847. Here we find no suspicious circumstances, evidence of dominion and/or control by the daughters or even an indication thereof. Specifically, when the will was drawn and executed Mrs. Belcher was not even present and the role of Mrs. Harper was that of a "chauffeur." *See Taliaferro*, 622 S.W.2d 829, and compare her role with that of the "messenger" there. The uncontroverted proof not only from Mrs. Harper, but also from Mr. Turner and his secretary, was that Mrs. Harper simply brought Mr. Watkins, Sr., to the law office; had absolutely no conversation about the will whatsoever; tried to leave the room after she had wheeled Mr. Watkins, Sr., into Mr. Turner's office, only to be told by her father to stay; and said nothing during the entire will drafting and execution process.

Independent of the day the will was made this record does not reveal any other basis for a finding of undue influence by the daughters. They had no more access to the father than did the sons. Their only sins appeared to be that they constantly went to visit Mr. Watkins, Sr., attended to his needs, and sided with their father in the dispute with his boys regarding the estate of Mrs. Watkins.

Based on this proof there is simply no basis for a finding of undue influence by anyone. In short, the disposition under the will was not "unnatural under the circumstances." *See Richmond v. Christian*, 555 S.W.2d at 108.

### THE LACK OF TESTAMENTARY CAPACITY QUESTION

■■■ We now turn our attention to the claim of lack of testamentary capacity. As to the burden of proof, the court held in *Parham v. Walker* that:

> Unless the deceased has already been adjudicated insane at the time of the execution of a will, the burden is always upon the one who alleges an unsound mind to prove it. See *Bridges v. Agee* (1932 M.S.) 15 Tenn.App. 351. *Even the existence of a guardianship or conservatorship is not per se an adjudication of an unsound mind, that is, an adjudication of mental incapacity to execute a will. Tucker v. Jollay* (1957 E.S.) 43 Tenn.App. 655, 311 S.W.2d 324.

568 S.W.2d at 624 (emphasis supplied).

Judge McAmis well stated the standard of competency, when that competency must be fixed in relation to the will, the relevant time frame for proof as to capacity, general evidentiary considerations and the weight to be given lay opinion testimony regarding competency in *American Trust & Banking Co. v. Williams*, 32 Tenn.App. 592, 225 S.W.2d 79 (1948):

> *The law* fixes the standard of mental capacity and *requires that a testator's mind, at the time the will was executed, must be sufficiently sound to enable him to know and understand the force and consequence of his act.* He is not rendered incapable of making a will by mere physical weakness or disease, old age, blunt perception, or failing mind and memory, if his mind is sufficiently sound to enable him to know and understand what he is doing. *Smith v. Harrison*, 49 Tenn. 230; *Nailing v. Nailing*, 34 Tenn. 630; *Fitch v. American Trust Co., Adm'r*, 4 Tenn.App. 87; *Bridges v. Agee*, 15 Tenn.App. 351, 355; *Melody v. Hamblin*, 21 Tenn.App. 687, 695, 115 S.W.2d 237; *Rogers v. Hickam*, Tenn.App., 208 S.W.2d 34; *Cude v. Culbertson*, Tenn. App., 209 S.W.2d 506, 507; *Farmers Union Bank v. Johnson*, 27 Tenn.App. 342, 354, 181 S.W.2d 369.
>
> *In determining testamentary capacity, the mental condition of the testator at the very time of executing the will is the only point of inquiry;* but evidence of mental condition both before and after

making the will, if not too remote in point of time, may be received as bearing upon that question. In so far as it has a reasonable tendency to bear upon the mental capacity of the testator when the will was executed, evidence of his physical condition both before and after the date of the will is also admissible. *But, apart from its effect upon the mind, the physical condition of the testator has no bearing on the issue.* See, generally, cases cited supra.

"Where a testator's sickness is wholly physical, proof of his condition as to lethargy, suffering, or unconsciousness on days preceding or following the execution of the will is entitled to very little consideration." 57 Am.Jur. 127, Wills, Section 135.

" 'The will permits of such prior and subsequent incapacity to be given, but unless it bears upon that period, and is of such a nature as to show the incompetency when the will was executed, it amounts to nothing.' Wigmore on Evidence, section 233, pages 291–292". *Bridges v. Agee,* supra, 15 Tenn.App. at page 355.

*Evidence of prior mental condition may have much, little or no probative value depending upon the nature and effect of the malady, whether general, habitual, continuous, chronic or progressive or due merely to temporary, superficial, accidental, occasional or intermittent causes or conditions.* If the debility falls within the first category, evidence of the testator's condition at a time other than the date of the execution of the will may shift the burden of proof and require the production of affirmative proof of his condition at the very time the will was executed.

It is a familiar rule that the mere opinions of lay witnesses as to soundness of mind are not evidence; *but, having detailed the conversation, appearance, conduct or other particular fact from which the state of mind may be judged, non-expert witnesses may state their conclusion or opinion.* It is the facts detailed, the conduct described which constitute evidence. *Fitch v. American Trust Co.,* 4 Tenn.App. 87, 101, *Melody v. Hamblin et al.,* 21 Tenn.App. 687, 695, 115 S.W.2d 237, 243. As said by Judge Felts in the latter case: " * * * *a verdict may be directed in favor of the will even where such witnesses have testified that in their opinion the testator was of unsound mind, unless facts and circumstances have been put in evidence which are sufficient to warrant the inference or conclusion that the testator was not of sound mind.*"

In *Rogers v. Hickam,* Tenn.App., 208 S.W.2d 34, cited supra, *the opinion of lay witnesses that the testator was of unsound mind, based upon their statements that before the will was executed he failed to recognize the witnesses, a daughter and her husband, that he stared and looked wild, and other circumstances detailed in the opinion, as against positive testimony that his mind was sound at the very time the will was executed, was held insufficient to support a verdict against the will.* A verdict was directed for the will in that case and in *Fitch v. American Trust Company,* supra, because the court determined as a matter of law that the facts and conditions related afforded no reasonable basis for the verdict.

32 Tenn.App. at 602–04, 225 S.W.2d at 83–84 (emphasis supplied).

Interestingly, in the *American Trust* case the court determined there was insufficient evidence to submit the issue of mental incapacity to the jury, though frankly there was probably more than here present.

Finally, regarding the legal background, the *Taliaferro* decision discusses the burden of proof when the will is attacked on the basis of incompetence of the testator.

The rules of burden of proof with regard to testamentary capacity are substantially similar to those with regard to undue influence. *See* Phillips, *Pritchard on Wills* § 144. Ordinarily, there exists a presumption of testamentary capacity

once the prima facie validity of the will is shown, but the existence of suspicious circumstances, once shown by the contestant, shifts the burden to the proponent to come forward with evidence that capacity existed, whereupon the issues goes to the jury. *Burrow v. Lewis,* 24 Tenn.App. 253, 142 S.W.2d 758 (1940).

[W]here the testator is aged, sick and infirm ... the proponent is onerated with the burden of showing that the testator comprehended the fact that he was about to execute his will and understood the contents of the paper. [No cases] hold that the burden of showing testamentary capacity rests upon proponent at any time or under the circumstances[,] [e]xcept when insanity is shown to have existed prior to the execution of the will.

*Id.* at 262, 142 S.W.2d at 763.

622 S.W.2d at 837.

■ At first blush the proof of the opponents of the will in the instant case might be considered sufficient to raise a jury question regarding the capacity of Mr. Watkins, Sr. Several witnesses, including Louise Williams and Ferrell Johnson, who must be considered as impartial, as well as his sons indicated that there were numerous periods when Mr. Watkins, Sr., was mentally incompetent because of the effects of the strong medication necessary to alleviate his suffering from back spasms. In fact, Mr. Johnson estimated that this was the case 80% of the time. Absent express proof as to what was the precise situation regarding whether Mr. Watkins, Sr., was taking medication on the day the will was made and his *then* mental state on February 12, 1979, a jury question might have been raised. This is so even though not one witness testified that during the general time frame when the will was executed that his mental deficiencies were other than drug related or that he was mentally incompetent all the time. The testimony

to this effect of each witness was emphasized in our resume of the facts.

However, this record reveals very clear proof as to specifics which overwhelmingly demonstrate that on the day when Mr. Watkins, Sr., caused his will to be prepared and then executed he was competent. In recapitulation, the uncontroverted testimony was that on February 12, 1979, the only day when an ultimate determination as to the competence of Mr. Watkins, Sr., was in issue, *see American Trust & Banking Co. v. Williams,* 225 S.W.2d at 84, he was free of pain, not taking any medication and in full possession of his faculties. The proof is that this was the testator's state from early that morning until late in the evening. Granted that two interested parties, Mr. and Mrs. Harper so testified. Significantly, however, four other disinterested persons testified to the same effect: Edward Kirkpatrick, the long-time acquaintance who visited at length with Mr. Watkins, Sr., at the funeral home, Lori Gibbs, the legal secretary, and two attorneys and officers of the court, Calvin P. Turner and Michael W. Ferrell. The explanation of every witness who saw Mr. Turner that day [3] was that his actions were those of a sane, rational and strong willed person.

Significantly in our view, over six months after the will was executed when final resolution of the estate of Mrs. Watkins, Sr., was being effected, Mr. Turner made a special trip to the boarding home to satisfy himself of the competence of Mr. Watkins, Sr. Mr. Turner made this visit because he had heard that the sons were asserting that Mr. Watkins, Sr., was of unsound mind. Mr. Turner's statement in the memorandum prepared immediately after that visit says it far better than we could: "In my opinion Mr. Watkins' mind is as sound as any of his children or either of the lawyers involved in the case." In view of his previous difficulties with his sons of

---

**3.** We have disregarded the testimony of the nurse, Louise Williams, who was obviously mistaken about seeing Mr. Watkins, Sr., on February 12, 1979, since she left at 5:00 p.m. and he did not return until after 9:00 p.m. In any event, Ms. Williams did not testify that on that day Mr. Watkins, Sr., was incompetent even assuming *arguendo* she saw him. In fact, her testimony was to the contrary.

very recent vintage it is as understandable to us as it was to his attorney, Mr. Turner, that the testator would want to leave his worldly possessions to his daughters, who had been supportive of their father in this dispute, to the exclusion of the opponents of the will whom he believed had mistreated him.

Predating the will by three months, Robert P. Hamilton, an attorney and the guardian ad litem in the conservatorship proceedings, interviewed Mr. Watkins, Sr., at length to be certain that he was in full possession of his faculties. The guardian *ad litem* came to the conclusion that Mr. Watkins, Sr., was "definitely of sound mind" at that time. This is not to mention the testimony of other nurses who were with him on a regular basis throughout this time frame and never found him to be irrational or incompetent.

We are not unmindful of the limitations on us in overturning a jury verdict approved by the trial judge. On review of a jury case in this court, we do not weigh the evidence to determine the preponderance thereof, nor do we decide the credibility of witnesses. Rather, our review is limited to a determination of whether there is any material evidence to support the verdict. In so doing we must take the strongest legitimate view of all the evidence to uphold the verdict, assume the truth of all that tends to support it and discard all to the contrary. We are bound to allow all reasonable inferences to sustain the verdict, and, if there is any material evidence to support the verdict, we must affirm. *Truan v. Smith,* 578 S.W.2d 73, 74 (Tenn.1979).

However, for all the reasons stated above we are satisfied that the matter should have been withdrawn from the jury at the conclusion of all the proof on both the question of undue influence and the issue of testamentary capacity due to a lack of any material evidence in support of either theory and a verdict directed for the proponent of the will.

Accordingly, the judgment is reversed and this cause is remanded for the entry of an order sustaining the validity of the will. The costs are taxed against the opponents of the will.

REVERSED AND REMANDED.

LEWIS and CANTRELL, JJ., concur.